IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EMBARCADERO TECHNOLOGIES, INC., and IDERA, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:17-cv-444-RP |
| REDGATE SOFTWARE, INC., REDGATE SOFTWARE, LTD., DAVID FRIGNOCA, and DUSTIN ABNEY, | § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are the Application for Preliminary Injunction, (Dkt. 1), and the Motion for Entry of Amended Order Granting Plaintiffs' Application for Preliminary Injunction, (Dkt. 74), filed by Plaintiffs Embarcadero Technologies, Inc. ("Embarcadero") and Idera, Inc. ("Idera") (together, "Plaintiffs"). The Court held a hearing on the application for a preliminary injunction on October 20, 2017, and October 23, 2017. After considering the pleadings, the briefs, the evidence presented, and the relevant law, the Court **DENIES** the application for a preliminary injunction.

## BACKGROUND

On May 11, 2017, Plaintiffs brought an action in this Court against four defendants, alleging eight claims. (Pls.' Orig. Compl., Dkt. 1). The claims arose from the departure of four employees of Embarcadero,[1] David Frignoca ("Frignoca"), Dustin Abney ("Abney") and two others, each of whom left Embarcadero and joined the same company. That company, Redgate Ltd., is incorporated in the United Kingdom and has a subsidiary called Redgate Inc., (together, "the Redgate Defendants"), which is incorporated in California. Frignoca left his position at

---

[1] Embarcadero was acquired by Idera in 2015. Defendants Frignoca and Abney worked for Embarcadero before the acquisition. After Idera acquired Embarcadero, Frignoca and Abney continued to sell what are referred to as Embarcadero legacy products—products that Embarcadero sold before the acquisition.

1

Embarcadero in October 2016 and joined Redgate Ltd. by the end of the month. Plaintiffs contend that he did so in violation of a contract he had signed. Additionally, while employed by Embarcadero, Frignoca uploaded various Embarcadero documents to his personal Google Drive and accessed them a few times after his employment with Embarcadero ceased. Plaintiffs contend that doing so constituted a misappropriation of trade secrets and a breach of his fiduciary duty to the company. Finally, since three former Embarcadero sales employees left to join Redgate after Frignoca did, Plaintiffs claim that he improperly solicited them in violation of his contract. Plaintiffs brought suit against Frignoca, Abney, Redgate Ltd., and Redgate Inc., alleging the following claims: (1) breach of contract (Frignoca); (2) breach of fiduciary duty (Frignoca); (3) aiding and abetting breach of fiduciary duty (the Redgate Defendants); (4) misappropriation of trade secrets in violation of the Federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (Frignoca and the Redgate Defendants); (5) misappropriation of trade secrets in violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A.001, *et seq.* (Frignoca and the Redgate Defendants); (6) violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* (Frignoca); (7) violation of the Texas Harmful Access by Computer Act, TEX. CIV. PRAC & REM. CODE § 143.001, *et seq.* (Frignoca); and (8) breach of contract (Abney). (Am. Compl., Dkt. 33, ¶¶ 32–69). Plaintiffs seek various remedies, but relevant here is their request for a preliminary injunction.

Plaintiffs filed a brief in support of their motion for a preliminary injunction and a request for a hearing on June 12, 2017. (Dkt. 14). On June 28, 2017, the Court scheduled a hearing on the application for a preliminary injunction for July 25, 2017. (Dkt. 26). Plaintiffs requested an extension of the hearing on July 14, 2017, (Dkt. 30), stating their preference for a date in early September, which the Court granted by resetting the hearing for September 6, 2017, (Dkt. 37). The Court needed to reschedule the hearing, so the Court reset the date for August 31, 2017, while giving the parties the option to have the hearing on October 20, 2017, if they preferred. (Dkt. 56). The parties

agreed to the October 20 hearing date, (Dkt. 60), so the Court rescheduled the hearing for October 20, 2017. (Dkt. 64). The hearing was held on October 20, 2017 and continued on October 23, 2017.

The relief sought by Plaintiffs has been characterized in a few different ways. In their original complaint, Plaintiffs requested a preliminary injunction that

> a. orders Defendants to return to Plaintiffs all confidential, proprietary and trade secret information of Plaintiffs within their possession, custody, or control, as permitted by 18 U.S.C. § 1836(b)(3)(A)(ii) and applicable state law;
>
> b. prohibits Defendants from using in any manner any confidential, proprietary and trade secret information of Plaintiffs, including confidential information regarding Plaintiffs' customers and products, including to solicit, switch and/or convert Plaintiffs' customers;
>
> c. prohibits Defendants from soliciting any of Plaintiffs' employees; and
>
> d. because there is, or will be, evidence of misappropriation and threatened misappropriation, prohibits Frignoca and Abney from continuing to work for or provide services to Redgate in which these individuals will be permitted to sell competing services to the customers that they personally serviced, or to the customers that their subordinates personally serviced, while employed with Plaintiffs, as permitted by 18 U.S.C. § 1836(b)(3)(A)(i)(I) and applicable state law.

(Orig. Compl., Dkt. 1, at ¶ 80). In their brief in support of their application for a preliminary injunction, Plaintiffs requested that the Court issue a preliminary injunction to

> prevent Defendants from: (a) using Plaintiffs' confidential information to solicit Plaintiffs' customers and leads for the purpose of selling products in competition with Plaintiffs; (b) otherwise disclosing or commercially using Plaintiffs' confidential information; (c) soliciting Plaintiffs' existing employees to terminate their employment with Plaintiffs, and (d) allowing Frignoca and Abney to engage in any business that competes with Plaintiffs in the United States.

(Mem. Supp. Appl. Prelim. Inj., Dkt. 14, at 2). Following the hearing, Plaintiffs submitted a request for a much broader injunction, which would include an absolute prohibition on Frignoca and Abney working for Redgate for a year and would force two employees of Redgate who are not parties to this suit to stop working at Redgate for three months and ten days. (Pls.' Mot. Entry Am. Order, Dkt. 74).

3

# DISCUSSION

## I. Post-Hearing Request for Amended Scope of Relief

Three days after the conclusion of the hearing, on October 26, 2017, Plaintiffs submitted a much more detailed request for injunctive relief tailored to each defendant. (Pls.' Mot. Entry Am. Order, Dkt. 74). In their request for entry of an amended order, Plaintiffs explain that they "have decided to change the scope of the requested injunctive relief." (*Id.* at 1). The scope of relief requested is significantly broader than that outlined in Plaintiffs' application for a preliminary injunction and brief in support of that application. For example, in their briefs, Plaintiffs indicated that they sought injunctions preventing Frignoca and Abney from working for Redgate only on a nationwide basis. (Pls.' Reply Abney Resp. Appl. Prelim. Inj., Dkt. 27, at 4 ("A nation-wide restriction on Abney's competition with Plaintiffs is warranted.")); Pls.' Reply Frignoca Resp. Appl. Prelim. Inj., Dkt. 29, at 4 ("[A] nation-wide exclusion is presently being sought by Plaintiffs.")). The newly proposed injunction seeks to prevent Frignoca and Abney from working for Redgate on a global basis. (Pls.' Mot. Entry Am. Order, Dkt. 74-1, at 5, 7). Plaintiffs also request in the proposed order, for the first time, relief against two former Embarcadero employees, Chad Tewis and Adam Altman, who are not parties to this suit. (*Id.* at 8) (requesting that the Court enter an order requiring that Redgate "place Chad Tewis and Adam Altman on leave with pay or leave without pay (at Redgate's election) until three months and 10 days from the date the Court signs this Order"). The rationale is the alleged violation by Frignoca of a non-solicitation agreement, but Plaintiffs have pointed to no case law supporting the position that the appropriate remedy for the violation of a non-solicitation agreement is to prohibit the solicited employees (not parties to the non-solicitation agreement) from working. More to the point, Plaintiffs gave no notice of their desire to expand the scope of their requested relief prior to or during the hearing.

Because of its timing, three days after the conclusion of the hearing and five months after the original request for a preliminary injunction, the Court declines to consider the amended request for relief to the extent it differs from Plaintiffs' previous characterizations of the scope of the injunction desired. Plaintiffs had plenty of opportunities to outline the contours of the injunctive relief sought prior to the hearing. To consider a new request for a broader injunction following the hearing would prejudice Defendants, who did not have an opportunity either before or during the hearing to respond to the expanded scope of relief requested after the hearing. Federal courts may issue preliminary injunctions "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The notice requirement, "with few exceptions, implies 'a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.'" *Williams v. McKeithen*, 939 F.2d 1100, 1105 (5th Cir. 1991) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda*, 415 U.S. 423, 432 n.7 (1974)). Here, the Defendants had ample notice that Plaintiffs were seeking a preliminary injunction, but they did not have notice of the specific relief requested on October 26, three days after the conclusion of the hearing. Therefore, the Court declines to consider this post-hearing request seeking a broader injunction.

## II.     Preliminary Injunction

A preliminary injunction is an extraordinary remedy; the decision to grant one is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief must "carr[y] the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Ft. Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (quotation marks and citation omitted).

5

Plaintiffs' delay in seeking injunctive relief is fatal to their request for a preliminary injunction. To the extent they have suffered any harm as a result of the events underlying their claims, much of that harm will have already occurred due to the delay; the appropriate remedy is therefore damages. The delay exhibited by Plaintiffs in seeking a preliminary injunction also casts doubt upon the supposed irreparability of the harm alleged. Further, to the extent that Plaintiffs could suffer irreparable harm from Frignoca's retention of the documents belonging to Plaintiffs on his Google Drive, his agreement to delete all such documents and turn them over to Plaintiffs negates the potential for any such harm.

With respect to Plaintiffs' effort to force Abney to cease employment with Redgate, in addition to the obstacle to demonstrating irreparable harm posed by Plaintiffs' delay in seeking relief, the covenant sought to be enforced against Abney is unreasonable, and the Court declines to reform the covenant at this stage of the proceeding because doing so would be inequitable.

**A.     Irreparable Harm**

Plaintiffs have failed to make a sufficient showing of irreparable harm with respect to all of their claims primarily because of the extensive delay they have exhibited in seeking a preliminary injunction. "A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, ET AL., 11A FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed., April 2017 update). Undue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable. *See Gonannies, Inc. v. Goupair.com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (finding that a delay of over six months rebutted any presumption of irreparable harm); *see also id.* ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.") (quoting *Wireless Agents, L.L.C. v. T-Mobile*

6

*USA, Inc.*, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief under the Taft-Hartley Act in light of, in part, a three-month delay in seeking the relief).

There was a significant delay between the time that Plaintiffs discovered that Frignoca was employed by Redgate—the genesis of this lawsuit—and when they sought an injunction. Plaintiffs were aware that Frignoca was working at Redgate as early as November 11, 2016, when Michael Shea told Embarcadero and Idera CEO Randy Jacops that Frignoca was now working at Redgate. (Shea email, Defs.' Exh. 509, Dkt. 72-6, at 41). Although Jacops suggested at the hearing that he was not completely certain that this information was correct until a few months later, when he saw Frignoca's name on a United Kingdom document listing members of boards of directors, Jacops testified that Shea had not given him inaccurate information in the past. Additionally, shortly thereafter, on November 17, 2016, Embarcadero acted upon this information by having an attorney send Frignoca a cease-and-desist letter reminding him of the agreement he signed while employed with Embarcadero. (Letter, Def.'s Exh. 510, Dkt 72-6, at 45). This action was filed on May 11, 2017, about six months later. (Compl., Dkt. 1). Plaintiffs did not request a hearing on or file a brief in support of their application for a preliminary injunction until June 13. When the Court set a hearing for July 25, Plaintiffs sought a delay of the hearing to a date in early September, nearly five months after they became aware of all of the facts underlying their claims in this lawsuit.

Plaintiffs point to *Daily Instruments Corp. v. Heidt* to support their argument that the delay in pursuing the preliminary injunction was reasonable. 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014) ("[D]elay will not negate a finding of irreparable harm where the plaintiff has a good explanation."). Here, Plaintiffs' explanation is not good enough. The court in *Daily Instruments* found it significant that the plaintiff was "a small company with no in-house attorney," and exercised diligence in pursuing the claims after waiting for four months to engage a forensic expert to examine its former

7

employee's laptop. *Id.* Additionally, the *Daily Instruments* court noted that the defendants contributed to the delay by waiting until the final business day before the state-court hearing was scheduled to remove the case to federal court and by opposing accelerated discovery in both state and federal court. *Id.* Here, Plaintiffs have not put forward similarly good reasons. Plaintiffs' contention that this delay was reasonable because Frignoca concealed his new employment from Idera and Embarcadero is unpersuasive in light of the evidence—the Shea email to Jacops and the cease-and-desist letter sent from Embarcadero to Frignoca—that Plaintiffs learned this information through other means in November 2016. And there is no evidence that the defendants in this case undertook any bad-faith efforts, as did the *Daily Instruments* defendants, to delay the Plaintiffs' opportunity to seek preliminary relief.

There was also significant delay between the time that Plaintiffs became aware of the other factors in this litigation—Frignoca's alleged solicitation of former Embarcadero employees,[2] Frignoca's downloading of Embarcadero files onto his Google Drive and failure to delete those files upon his departure from Embarcadero,[3] and Abney's employment with Redgate—and when Plaintiffs sought preliminary injunctive relief. If the harm Plaintiffs feared were indeed irreparable, it is unclear why they, knowing all of the primary facts forming the basis for their claims by April at the latest, filed the complaint on May 11, did not request a hearing or file a brief supporting their application for a preliminary injunction until June 12, and, once the Court set a hearing for July 25, requested that the hearing be moved to early September.

---

[2] Chad Tewis and Adam Altman, both of whom formerly worked at Embarcadero and currently work at Redgate, resigned in December 2016, (Tewis Resignation and Altman Resignation, Pls.' Ex. 21, Dkt. 72-3, at 102–03), and were working at Redgate by March 2017 (Frignoca email to Altman, Tewis, and Abney, Def.'s Ex. 515, Dkt. 72-6, at 57). Abney left Embarcadero in January 2017 and began to work at Redgate in March 2017. (Abney Resignation, Pls.' Ex. 29, Dkt. 72-4, at 33; Abney Decl., Def.'s Ex. 3, Dkt. 72-6, at 3). Jacops testified at the hearing that he was aware that Tewis, Altman, and Abney (unlike Frignoca) had all updated their social media information within a month of joining Redgate, which means that he was aware they had joined Redgate by April 2017.
[3] Jacops testified that he ordered a forensic investigation of Frignoca's laptop in late March after a conversation with Redgate CEO Simon Galbraith.

8

### 1. Breach of Contract: Frignoca

Plaintiffs' delay in pursuing injunctive relief against Frignoca for breach of his employment agreement (the "Unit Agreement") is fatal to their application for a preliminary injunction barring Frignoca from employment with Redgate. The delay was so substantial that by the first day of the preliminary injunction hearing, October 20, 2017, one year had passed since Frignoca's last day at Embarcadero. (*See* Frignoca Termination Letter, Pls.' Ex. 13, Dkt. 72-2, at 69). The Unit Agreement's restriction of one year for noncompetition, (Unit Agreement, Pls.' Ex. 5A, Dkt. 72-2, at 9) had already expired. *See Rimkus Consulting Grp., Inc. v. Cammarata* 255 F.R.D. 417, 438 (S.D. Tex. 2008) (citing *Gaylord Broadcasting Co. v. Cosmos Broadcasting Corp.*, 746 F.2d 251, 254 (5th Cir. 1984)) (denying a preliminary injunction in part because "Rimkus's delay in seeking injunctive relief in this court consumed most of the covenants' stated period"). Eleven months had passed since Jacops was notified that Frignoca had gone to Redgate and had acted on that knowledge by directing an attorney to send him a cease-and-desist letter. At most five weeks of this delay can be attributed to Plaintiffs' accommodation of the schedules of the Defendants and of the Court. The remaining ten months of delay was caused by Plaintiffs—they waited until May 11, 2017, to file their complaint; they waited until June 13 to file a brief in support and request a hearing; they requested an extension of the hearing the Court originally set for July 25 to a date in early September. The delay counsels against a finding that any feared future harm will be irreparable. It also suggests that any harm that may stem from Frignoca's departure for Redgate, if doing so was in fact a breach of the Unit Agreement,[4] has already occurred and therefore can be compensated adequately with a remedy at law—damages. Idera and Embarcadero CEO Randy Jacops testified that he believes that as of now, Plaintiffs have provable damages. Any harm likely to occur has already occurred, and Plaintiffs will

---

[4] Frignoca has challenged the validity of the Unit Agreement on numerous grounds. Because the Court declines the request for a preliminary injunction on the basis of the Unit Agreement due to the failure to demonstrate irreparable harm, the Court need not consider the validity of the Unit Agreement at this time.

be entitled to recover for any such harm monetarily if they make the requisite showing at trial. The Court finds that the delay between the discovery of Frignoca's new employment and the date Plaintiff sought a preliminary injunction means that the threat of irreparable harm with respect to Frignoca's employment with Redgate is insufficient to justify granting the extraordinary relief sought.

Plaintiffs' delay is also fatal to their attempt to show irreparable harm stemming from Frignoca's alleged breach of the non-solicitation portion of the Unit Agreement. Plaintiffs could not have learned of the events forming the basis of their non-solicitation agreement—the departure of Abney, Tewis, and Altman and their subsequent arrival at Redgate—until after Frignoca left, so the delay is not as extreme as the delay with respect to the non-compete portion of the Unit Agreement. However, Jacops testified at the hearing that he was aware that Tewis, Altman, and Abney, (*see supra* note 2), had all updated their social media accounts to reflect that they had moved to Redgate within a month. Because Tewis, Altman, and Abney were all working at Redgate by mid-March, Jacops was aware of the events underlying Plaintiffs' non-solicitation breach-of-contract claim by mid-April at the latest. And yet Plaintiffs did not find the harm feared pressing enough to require a hearing on their application for a preliminary injunction until early September, nearly five months later.

### 2. Breach of Contract: Abney

As mentioned above, Plaintiffs were aware that Abney was working at Redgate, the basis for their breach of contract claim against him, by mid-April. They delayed their chance to present their case for a preliminary injunction to the Court until early September. This defeats their attempt to show irreparable harm stemming from Abney's alleged breach of his employment agreement.

### 3. Misappropriation of Trade Secrets

Plaintiffs' delay in seeking a preliminary injunction, by itself, supports a finding that they have not met their burden to show irreparable harm with respect to their trade secret claims. But the

10

Court has an additional basis for finding that an injunction is not needed to prevent the irreparable harm feared by Plaintiffs arising from Frignoca's continued possession of Embarcadero files in his Google Drive. Frignoca has agreed to delete all of these documents from his Google Drive and turn them over to Plaintiffs. Therefore, Plaintiffs are unlikely to suffer any harm in the future from Frignoca's possession of these documents on his Google Drive that would merit a preliminary injunction.

Plaintiffs' concern about the documents on Frignoca's Google Drive is understandable. Even if, as Frignoca has stated, he has only accessed a few documents and did not use them for any improper purposes, if the documents were to remain in his possession, the threat of irreparable harm to Plaintiffs could still be significant. Three examples of documents contained on Frignoca's Google Drive brought to light at the hearing are: (1) a spreadsheet containing worldwide information on all of Embarcadero's and Idera's business, including deals in various stages of fruition, (Pls.' Ex. 22, Dkt. 72-3, at 123); (2) Plaintiffs' pricing model, (Pls.' Ex. 18, Dkt. 72-3, at 1), which Plaintiffs' COO Chris Smith testified that he considers highly confidential because it is an algorithm for determining how to adjust pricing and how different price adjustments would affect Plaintiffs' business; and (3) a document titled "Historic Sales," (*id.*), which includes detailed information concerning past sales made by Plaintiffs.

For one thing, Frignoca admits that he accessed documents located in his Google Drive that originated from Embarcadero after leaving Embarcadero. Frignoca stated that he only did so because he was poking around to see examples of certain reports he wanted to run for his sales team at Redgate. Frignoca also said that when he accessed a document containing a trove of Embarcadero sales data, he only viewed the cover sheet, which does not include confidential information. The information on his Google Drive includes many Embarcadero documents, some of which may include confidential information, and some of which do not. While it will be the burden of Plaintiffs

11

to show at trial that particular documents included information that merits trade secret protection, Plaintiffs have demonstrated that they could be in danger of suffering irreparable harm if Frignoca were to retain access to all of the documents on his Google Drive.

However, in light of the representations made by counsel for Frignoca, it is unnecessary for the Court to mandate injunctive relief for Frignoca to delete the documents from Embarcadero contained in his Google Drive. In Frignoca's response to Plaintiff's Application for a Preliminary Injunction, he noted that he did not disagree with Plaintiff's request to prohibit him from using confidential information, (Frignoca Resp. Appl. Prelim. Inj., Dkt. 24, ¶ 40), which in that iteration was defined by Plaintiffs as:

> the written and electronically stored versions of Plaintiffs' database, which contains information such as the identities of the decision-makers for each customer or potential customer, their contact information, customer relationship history, and the details of the ongoing maintenance contracts that Plaintiffs has with its customers (including such details as the length of the contract, the specific services the customer needs performed at various locations, the customer contacts for the job, the revenue to be earned during the contract, and customer payment history).

(Pls.' Proposed Order, Dkt. 14, at 3)).

Frignoca declared through briefing that "with Plaintiffs' approval Frignoca would like to delete the files from his Google Drive." (Frignoca Resp. Appl. Prelim. Inj., Dkt. 24, ¶ 42). Additionally, at the hearing, counsel for Frignoca declared that Frignoca was ready to turn over and delete all information on his Google Drive belonging to Embarcadero or Idera, and counsel for Plaintiffs recognized Frignoca's cooperation in this regard. In light of these circumstances, the Court finds that a preliminary injunction is not necessary to prevent potential harm stemming from Frignoca's possession of the Embarcadero and Idera documents in his Google Drive.[5] If any difficulties regarding the documents on Frignoca's Google Drive arise, however, the parties may notify the Court.

---

[5] Because Plaintiffs' claims for misappropriation of trade secrets and computer violations under both federal and state law (four in total) all stem from the same underlying Google Drive information, this finding of failure to show irreparable harm applies to all four claims.

12

### 4. Breach of Fiduciary Duty

The breach of fiduciary duty claim against Frignoca and the aiding and abetting breach of fiduciary duty claim against the Redgate Defendants arise from the same facts as the misappropriation of trade secrets claims do—Frignoca's uploading Embarcadero documents to his Google Drive and retention of them after departing Embarcadero. (Pls.' Mem. Appl. Prelim. Inj., Dkt. 14, at 12). The delay between Plaintiffs' discovery of these facts and pursuing injunctive relief based on these claims also prevents a showing of irreparable harm. Plaintiffs have therefore failed to demonstrate the requisite danger of irreparable harm to support a preliminary injunction with respect to these two claims, as well.

### B.     Likelihood of Success and Balance of the Equities: Abney

Plaintiffs' failure to show a likelihood of irreparable harm absent an injunction prohibiting Abney from working for Redgate serves as an independent basis for denying the injunction against Abney. But the Court further finds that Plaintiffs are insufficiently likely to succeed on the merits on the contract claim against Abney as Plaintiffs desire to enforce it and that the equities do not support reformation of the covenant not to compete at this stage. Plaintiffs seek a nationwide injunction preventing Abney from working for Redgate at all. In the alternative, they have indicated that they would like for the Court to reform the agreement to conform with the requirements imposed on covenants not to compete by Texas law.[6] (Pls.' Mem. Supp. Appl. Prelim. Inj., Dkt. 14, at 11 n.6 ("Even if the Court finds that portions of the non-compete are unreasonable, the proper approach is to reform the agreement to conform with the requirements of the statute.")). However, Plaintiffs have been less than forthcoming in divulging information regarding which customers Abney serviced while employed by Embarcadero—information stored on the Salesforce database to which they have access but Abney does not—that would enable a reasonable reformation of the

---

[6] While Plaintiffs disagree with Frignoca about whether Delaware law or Texas law applies to his Unit Agreement, the parties agree that Texas law governs Abney's contract.

covenant. Because of Plaintiffs' reluctance to look for information in their possession, preferring instead to seek an overly broad nationwide restriction on Abney's employment with Redgate, the equities do not favor Plaintiffs.

"Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the [Covenants Not to Compete] Act." *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). The Texas Covenants Not to Compete Act states that non-compete agreements are enforceable if they contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE § 15.50(a). If the agreement contains limitations that are not reasonable or impose a greater restraint than is necessary, "the court shall reform the covenant to the extent necessary" to render it reasonable. *Id.* § 15.51(c).

Covenants not to compete are deemed unreasonable in scope if they prohibit contact with customers with whom the defendant had no contact while employed. *See Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386–87 (Tex. 1991) (invalidating an agreement applying to "any of [the employer's] clients worldwide," not just those clients with which the employee "had some actual contact"). Geographically, "a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (affirming trial court's reformation of geographic area of covenant to Harris County and Fort Bend County, where the majority of Butler's customers were when employed by Arrow). "A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant." *Id.* at 793–94.

In *Peat Marwick*, the Texas Supreme Court held a provision that "[i]nhibt[ed] departing partners from engaging accounting services for clients who were acquired after the partner left, or with whom the accountant had no contact while associated with the firm" to be "overbroad and unreasonable" because it was "not reasonably necessary to protect" the business interest of preventing the former employee from establishing rapport with clients and then, after departing, taking those clients with him. *Peat Marwick*, 818 S.W.2d at 388.

Abney was hired in September 2015 to work for Embarcadero through Insight Global, a staffing company. (Abney Decl., Dkt. 72-6, at 1). He was on Insight Global's payroll but worked for Embarcadero—he went to work at Embarcadero's place of business, reported to Embarcadero managers, and sold Embarcadero software. (*Id.*). His title was "lead development representative," and it was his responsibility to assist sales account executives in the sales process for Embarcadero's software (now referred to as the Embarcadero legacy products). (*Id.* 1–2). On January 11, 2016, a few months after Idera's acquisition of Embarcadero, he was formally declared to be an employee of Idera and placed on Idera's payroll. (*Id.* at 2). On this date he also signed an agreement including a covenant not to compete. (*Id.*). Beginning July 1, 2016, Abney became a sales account representative (a "geo rep") and was assigned a specific geographic territory for sales. (*Id.*).

In Abney's first position as a lead development representative, his duties included "communicating with and helping sales representatives sell products to accounts on a national basis." (Abney Dep., Pls.' Ex. 48, 173:9–16 (hereinafter "Abney Dep.")). His duties were nationwide from the time of his hiring until April 2016, when he took over a specific territory. (Abney Dep., 76:9–20). This geographic area was composed of eight states: Colorado, Nebraska, Kansas, Oklahoma, Iowa, Missouri, Illinois, and Indiana. (Def.'s Exh. 4, Dkt. 72-6, at 8–9). At Redgate, Abney has two sets of responsibilities: (1) a list of assigned accounts of existing clients and (2) a geographic region over which he has free rein to develop leads as he sees fit. (Abney Dep., 160:10–

15

24). The existing clients Abney services are in that same geographic region. (Abney Decl., Def.'s Ex. 3, Dkt. 72-6, at 4). All of his current existing clients are the same as the existing clients he was assigned when he first began working at Redgate in March. (Abney Dep., 188:9–12). His sales territory at Redgate—Vermont, Maine, Maryland, Rhode Island, Delaware, New Jersey, New Hampshire, and Massachusetts, (Abney Decl., Def.'s Ex. 3, Dkt. 72-6, at 3)—contains no geographical overlap with his territory at Embarcadero. His original declaration indicated that, to the best of his memory, he thought his territory at Embarcadero included Maryland and Rhode Island, but Embarcadero's documents reveal that these two states were not included in his territory there. (Def.'s Exh. 4, Dkt. 72-6, at 8–9). Therefore, there is no geographical overlap between his Embarcadero territory and his Redgate territory.

Despite this geographic limitation in Abney's duties after his promotion at Embarcadero, Plaintiffs contend that they are nonetheless entitled to a nationwide injunction because prior to his promotion, Abney's job as a sales lead representative entailed working on sales leads on a nationwide basis. However, even though they likely possess the information regarding which clients and potential clients Abney served as a sales lead representative in their Salesforce database, they have not produced such a list. If the Court were to issue an injunction worded as Plaintiffs requested in their original application for a preliminary injunction, prohibiting Abney from "continuing to work for or provide services to Redgate in which [he] will be permitted to sell competing services to the customers that [he] personally serviced, or to the customers that [his] subordinates personally serviced, while employed with Plaintiffs," (Orig. Compl., Dkt. 1, at ¶ 80), it would be difficult to obey without knowledge of who those customers were. Such an injunction might be more appropriately tailored to the reasonableness required by Texas courts for covenants not to compete than would a nationwide injunction, but it would be impossible for Abney to follow faithfully if he did not have a list of all of the customers he personally serviced while at Embarcadero. It would also

16

be impossible for the Court to determine whether Abney was following the order for enforcement purposes.

Abney testified in his deposition that to the best of his knowledge he has not talked to any potential customers while employed by Redgate that he did while working for Embarcadero. (Abney Dep., at 153:1–23). In the interest of figuring out which customers he had serviced while at Embarcadero, he asked Embarcadero through counsel for a list of customers that he serviced while employed by Embarcadero but received little helpful information in response. (Nesbitt letter, Def.'s Ex. 8, Dkt. 72-6, at 19–20 (asking which customers Abney personally served); Pls.' Objs. Reqs. Produc. Interrogs., Def.'s Ex. 7, Dkt. 72-6, at 14 (refusing to identify customers personally serviced by Abney on the basis of various objections and referring Abney to approximately 10,500 pages of documents)). Plaintiffs likely had access to that information and probably could have generated a list of Abney's customers, since he kept track of them via his Salesforce database, but COO Chris Smith testified at the hearing that he had not directed anyone to attempt to generate such a list, nor was he aware of anyone having done so.

Here, Plaintiffs seek an injunction preventing Abney from working for Redgate for any customer, regardless of whether Abney had any contact with that customer. This proves too broad. Plaintiffs have not provided the Court—nor have they pointed to any attempts to provide the Court—with a list of customers that Abney serviced. They would rather have the Court issue a sweeping injunction prohibiting Abney from working for Redgate at all. Without the tools to properly reform Abney's covenant, the Court declines to do so at this stage.

## CONCLUSION

Plaintiffs have failed to demonstrate that they would suffer irreparable harm absent a preliminary injunction. Further, Plaintiffs have failed to demonstrate a likelihood of success on the merits or that the equities are in their favor with respect to their claim against Abney. Plaintiffs'

application for a preliminary injunction, (Dkt. 1), is **DENIED**. The Court further **DENIES** Plaintiff's Motion for Entry of an Amended Order Granting Plaintiffs' Application for Preliminary Injunction, (Dkt. 74).

**SIGNED** on November 20, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE